UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KELLY CRAMASTA,

    Plaintiff,

v.                                                    CASE No. 8:12-CV-1461-T-23TGW

WALGREEN INCOME PROTECTION
PLAN FOR PHARMACISTS AND
REGISTERED NURSES, et al.,

    Defendants.

_____

## REPORT AND RECOMMENDATION

The plaintiff, Kelly Cramasta, brought this lawsuit alleging that the defendants violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1001 et seq., by denying her benefits under an employer-sponsored disability plan. The parties have filed cross-motions for summary judgment. Because the defendants failed to consider properly the characteristics of the plaintiff's diagnosis of fibromyalgia, the denial of benefits with respect to that condition was fundamentally flawed. Consequently, I recommend that the plaintiff's motion for summary judgment be granted to the extent that the matter be remanded to the defendants for

further consideration of the plaintiff's fibromyalgia.  I also recommend that

the defendants' motion for summary judgment be denied.

I.

The plaintiff, a pharmacist who began her employment with the

Walgreen Company ("Walgreens") in 1999, last reported for work on

September 16, 2011  (Doc. 41, p. 2; AR 000092-93[1]).  The pharmacist

position is classified as a light duty occupation, and requires "continual

walking & standing" with "some bending & reaching" (AR 000404).

Walgreens, a nationwide chain of retail drug and other health

facilities, sponsors a disability benefits plan for its employees, known as the

Walgreen Income Protection Plan for Pharmacists and Registered Nurses

("the Plan") (Doc. 19, ¶6; Doc. 42, p. 2).  The Plan provides short-term and

long-term disability benefits to qualifying pharmacists (Doc. 19, ¶8; Doc. 42,

p. 2).[2]

---

[1]Pursuant to the court's Order (Doc. 32), the defendants have filed the administrative record in this case (Doc. 34).  Citations to "AR" refer to pages contained in the administrative record.

[2]To be eligible for benefits under the Plan, the employee must: (1) "be a Walgreen Co. pharmacist or a licensed registered nurse"; (2) "work an average of 30 or more hours per week for the most recent 52-week period (If [the employee has] worked for Walgreens for less than one year, [her] average will be calculated based on the time [she has] worked"; and (3) "have at least six months of continuous service" (AR 001105).

-2-

According to Timothy McGrory, a senior benefits attorney for Walgreens, "[t]he Plan is memorialized in a document titled, Income Protection Plan for Pharmacists and Registered Nurses – Summary Plan Description," and that document "serves as both a summary of the Plan and the Plan itself" (Doc. 48-1, ¶¶2, 6, 7). The Summary Plan Description ("SPD") accordingly states that it is "**the official Income Protection Plan governing document for purposes of describing the various plan provisions**" (AR 001102) (emphasis in original). As an eligible pharmacist under the Plan, the plaintiff received a copy of the SPD (see Doc. 41, p. 2).

The SPD outlines the Plan's eligibility requirements, definitions, waiting period, and benefits schedule (see AR 001101-24). Benefits received during the first 180 days of a disability are "short-term" benefits, and benefits received after 180 days are "long-term" benefits (AR 001108). An employee is eligible for long-term benefits after she has "accumulated a total of 180 disability days during any consecutive 365 day period" (id.). Under the heading "**What it Means to be Disabled**," the SPD states, in pertinent part (id.) (emphasis in original):

You are eligible for plan benefits when a disability resulting from illness, injury or pregnancy prevents you from working.   Disability is defined as follows:

**Short-Term Disability**
When you meet the eligibility requirements for short-term disability benefits, the words "disabled" or "disability" mean that, due to sickness, pregnancy or accidental injury, you are receiving appropriate care and treatment from a doctor on a continuing basis and you are prevented from performing one or more of the essential duties of your Walgreens occupation.

. . .

**Long-Term Disability**
For the long-term disability period, "disabled" or "disability" means that, due to sickness, pregnancy, or accidental injury, you are prevented from performing one or more of the essential duties of your own occupation and are receiving appropriate care and treatment from a doctor on a continuing basis; and

- for the first 18 months of long-term benefits, you are unable to earn more than 80% of your pre-disability earnings or indexed pre-disability earnings at your own occupation from any employer in your local economy; or

- following that 18 month period, you are unable to earn more than 60% of your indexed pre-disability earnings from any employer in your local economy at any gainful occupation

> for which you are reasonably
> qualified, taking into account your
> training, education, experience, and
> pre-disability earnings.

Walgreens, the plan administrator, is responsible for payment of benefits under the Plan (Doc. 42-1, ¶3; AR 001108, 001122). Sedgwick Claims Management Services, Inc. ("Sedgwick") acts as the Plan's third-party claim administrator (id.). In this connection, the SPD states that Sedgwick has the authority "to construe and interpret the Plan and make benefit determinations, including claims and appeals determinations" as Sedgwick "deem[s] appropriate in [its] sole discretion" (AR 001119).

Sedgwick agreed to administer claims under the Plan pursuant to the Service Agreement for Administration of a Claims Program, which became effective on July 1, 2004, and an Addendum to the Service Agreement, effective July 1, 2010 (AR 001125-80). Among other things, the service agreement states that Sedgwick is responsible for reviewing and processing claim and loss reports received from Walgreens, investigating each qualified claim, and arranging for "independent investigators, appraisers or medical or other experts to the extent deemed necessary by Sedgwick CMS in connection with processing any Qualified Claim" (AR 001125).

Eligible pharmacists may submit a claim for benefits under the Plan by calling Sedgwick (AR 001117). In doing so, the claimant "will be asked to provide information about [herself], [her] job, [her] illness/injury, and [her] doctor" (id.). The SPD also advises that a claimant "may be required to submit to an independent medical examination" (id.).

On September 19, 2011, the plaintiff contacted Sedgwick to file a claim for short-term disability benefits due to fatigue, migraines, numbness/tingling in her upper extremities, joint/body pain, and myasthenia gravis (Doc. 41, p. 4; Doc. 42, p. 5 n.8; AR 000093).[3] The plaintiff's claim was assigned to Maria Almalvez, a Sedgwick disability specialist (AR 000092).

Following a conversation with the plaintiff, Almalvez noted that the plaintiff's claim was "pending until medical is received & reviewed" and that the plaintiff "agreed to follow up on her medical" (id.). On September 20, 2011, Almalvez sent the plaintiff a letter outlining the information needed to process the claim, requesting that the plaintiff review the SPD, and advising the plaintiff that "Sedgwick CMS makes all determinations about

---

[3] The diagnosis of myasthenia gravis was subsequently ruled out (see AR 000511).

your final eligibility for a benefit. Walgreens Family of Companies does not" (AR 000095-96).

        As part of the claim review process, Sedgwick requested copies of the plaintiff's medical records, including clinical evaluation notes, diagnostic test results, hospital discharge summaries, operative reports, progress notes, and disabling conditions and restrictions (see, e.g., AR 000106). In response to these requests, Sedgwick received, among other records, treatment notes and letters from Dr. Lara Katzin (a neurologist at USF Health) and Dr. Lisa Khalil (an internist and the plaintiff's primary care physician). In addition, Dr. Khalil sent Sedgwick a report prepared by Dr. Dennis Ledford, an allergy, asthma, and immunology specialist.

        Dr. Katzin treated the plaintiff in September 2011, for complaints of pain throughout her body, tingling, difficulty sleeping, and problems getting comfortable when laying down (AR 000363). She noted that the plaintiff had a positive AchR antibody, and the plaintiff had not improved with Mestinon (id.). Dr. Katzin stated that the plaintiff's "symptoms are also not typical for MG [myasthenia gravis] either. Her complaints sound more like fibromyalgia currently" (id.).

Dr. Katzin sent a letter on September 30, 2011, to Sedgwick in support of the plaintiff's application for benefits (AR 000199). The entire body of the letter stated (id.):

> Kelly Cramasta is currently unable to work due to joint/neck pain, numbness/tingling in extremities, chronic fatigue, frequent sinus infections, bladder frequency/incontinence, and frequent IBS. She has been unable to work since 9/19/11. While I do not have a diagnosis for her symptoms she can not work with the symptoms that she does have.

Dr. Khalil's treatment notes from September 2011, indicate that the plaintiff was unsure whether her breast implants were causing problems with her health and she wanted to undergo testing (AR 000255). At that time, Dr. Khalil diagnosed the plaintiff with "? Fibromyalgia related to implants," and noted that the plaintiff would be seeking treatment from the Mayo Clinic (id.).

The next day, Dr. Khalil wrote a note on a prescription pad stating that the plaintiff was unable to work and it was unknown when the plaintiff would be able to return to work (AR 000253). Subsequently, in a letter dated October 3, 2011, Dr. Khalil said, "[i]t is in my medical opinion

that [the plaintiff] be put on short term disability until it is medically determined if she will be able to return to work" (AR 000203).

At the request of Dr. Khalil, the plaintiff was examined by Dr. Ledford on September 29, 2011 (see AR 000204-06). After a physical examination, Dr. Ledford's impression included "[c]hronic fatigue syndrome with some features of fibromyalgia but no evidence of scleredema or autoimmune disease" (AR 000204). In this regard, Dr. Ledford explained (AR 000205-06):

> The combination of irritable bowel syndrome, chronic migraine headaches, features of fibromyalgia, particularly in the upper body, and the poor sleep pattern would lead me to conclude that she has fibromyalgia with chronic fatigue syndrome and no[t] a collagen vascular disease or chronic infection. However, I feel that we have to exclude any infectious treatable condition so I suggested l[y]me antibody, Western blot testing, hepatitis panel, and serology for ehrlichiosis.

He concurred with Lyrica treatment and "[e]ncourage[d] activity and aerobic weight and buildup of tolerance to physical activity" (AR 000206).

On October 7, 2011, Sedgwick denied the plaintiff's claim for short-term disability benefits on the basis that the plaintiff had not provided

objective medical evidence to support her allegations of disability (AR 000348-49).

Sedgwick advised the plaintiff of her right to appeal the denial of her claim by submitting a written request for review within 180 days of receiving the denial letter (AR 000349). Thereafter, the plaintiff notified Sedgwick of her intent to appeal the denial of her claim (see AR 000063, 000261-63). In support of the plaintiff's appeal, Sedgwick received medical records from, among other providers, Dr. Ledford, the Mayo Clinic, and Dr. Khalil.

Dr. Ledford saw the plaintiff on October 18, 2011, for her primary complaints of pain in her neck, sleep disturbance, generalized joint pain, decreased energy, urinary urgency and frequency, and headaches (AR 000409). Upon examination, Dr. Ledford indicated that "[f]ibromyalgia tenderness particularly in the upper portion of the body was noted" (id.).

Dr. Pedro Malavet, an internist at the Mayo Clinic, met with the plaintiff for a consultation regarding "[s]evere fatigue and multiple somatic complaints in the setting of a history of diagnosis of myasthenia gravis" (AR 000889). Dr. Malavet's examination of the plaintiff's joints revealed

"significant tenderness" in the wrists, elbows, shoulders, hips, knees, and the

muscle groups on the upper arm and the thigh (AR 000891). His assessment

included "multiple somatic complaints with generalized fatigue and multiple

joint pain" (id.). In this regard, Dr. Malavet said (AR 000891-92):

> Suspect the patient has ... underlying symptoms of
> sensitization disorder with fibromyalgia type
> symptoms. It is unclear if the patient also has
> myasthenia gravis even though on examination she
> did not have easy fatigability. I do not suspect the
> patient has underlying severe myasthenia gravis.

With respect to her multiple joint pains and fatigue, Dr. Malavet noted that

the plaintiff would undergo serological studies, and he referred the plaintiff

to the Mayo Clinic's rheumatology department for further consultation (AR

000892).

Dr. Ronald Butendieck, a Mayo Clinic rheumatologist, examined

the plaintiff on October 26, 2011 (AR 000844-46). He found "widespread

muscle tenderness and trigger points consistent with fibromyalgia in upper

and lower extremities proximally and distally as well as back and anterior

chest" (AR 000845). The plaintiff's rheumatological panel was "completely

negative" and there was no evidence of an underlying systemic autoimmune

inflammatory disease (id.). Dr. Benjamin Wang, also a rheumatologist,

"examined and interviewed" the plaintiff with Dr. Butendieck, and he concurred with Dr. Butendieck's assessment, findings, and recommendations (AR 000846).

The next day, Dr. Christopher Sletten evaluated the plaintiff for possible participation in a pain rehabilitation program (AR 000616-17). He concluded that the plaintiff is "a very good candidate for pain rehab" (AR 000616). The assessment was fibromyalgia, abdominal pain, and insomnia (AR 000617).

Dr. Khalil saw the plaintiff again in November 2011, after the plaintiff's consultations at the Mayo Clinic (AR 000632). At that time, Dr. Khalil's plan included a diagnosis of fibromyalgia and a recommendation that the plaintiff see pain management (id.).

In conjunction with the plaintiff's appeal, Regina Crenshaw, a Sedgwick appeals specialist, arranged for Dr. Siva Ayyar, a specialist in occupational medicine, to perform an independent medical review of the plaintiff's claim (AR 000053, 001076-82). Dr. Ayyar reviewed "[a]ll 264 pages of medical, insurance, and administrative records" provided by Sedgwick "in their entirety" (AR 001078).

As part of the assessment, Dr. Ayyar spoke with Dr. Ledford and Dr. Scott Anderson, an allergist (AR 001077-78).[4]  Dr. Ayyar noted that, upon reviewing the plaintiff's chart, Dr. Ledford "was perplexed by [the plaintiff's] continuing complaints and felt that fibromyalgia was the most likely diagnostic consideration.  He further stated that he had no comment on [the plaintiff's] claim for disability" (AR 001077).

In a report dated November 8, 2011, Dr. Ayyar opined that the plaintiff "is not disabled from her usual and customary, unrestricted light physical demand job as a pharmacist for Walgreens during the timeframe in question, 09/19/11 through present" (AR 001080).  Dr. Ayyar provided the following "rationale" for this conclusion (AR 001081):

> Ms. Cramasta has a benign neurological examination, with full, preserved 5/5 strength about the bilateral upper and lower extremities, normal gait, normal sensory examination, normal cranial nerve testing, normal deep tendon reflexes, normal sensorium, normal muscle bulk, normal muscle tone, normal power about the bilateral upper and lower extremities.
>
> . . .

---

[4] Dr. Ayyar's report states that attempts to contact Dr. Malavet, Dr. Khalil, and Dr. Katzin were unsuccessful (AR 001076-77).

Thus, the reported diagnoses of fibromyalgia, chronic fatigue, migraine headaches, joint pain, myalgias, and/or myasthenia gravis are not restricting, limiting, disabling, or debilitating during the timeframe under review, 09/19/11 through present.

Ms. Cramasta's nonspecific complaints of body aches, pains, myalgias, and arthralgias, in the absence of associated neurological deficits, are insufficient for me to certify her disabled from her usual and customary, unrestricted occupation as of 09/19/11.

Moreover, Ms. Cramasta has had near normal to normal diagnostic testing. She has had a negative EMG/NCV of the bilateral upper and lower extremities.... MRIs of brain and sinuses were largely negative and do not reveal any specific findings, which might account for Ms. Cramasta's symptoms. Her cervical spine MRI likewise was equivocal; her CT scan of the abdomen and pelvis were essentially normal.

Thus, there is no medical (factual) basis to certify Ms. Cramasta disabled from her usual and customary unrestricted light physical demand occupation as a pharmacist during the timeframe in question, 09/19/11 through present.

Following receipt of Dr. Ayyar's report, Sedgwick upheld its denial of the plaintiff's claim for short-term benefits (AR 001083-86). Thus, in a letter to the plaintiff dated November 21, 2011, Sedgwick explained that

"[f]rom an Occupational medicine perspective, there are no clinical objective findings to support your inability to perform in your regular unrestricted job as a Pharmacist from September 19, 2011 to your return to work date" (AR 001085).

The denial letter advised the plaintiff that she or her authorized representative may appeal Sedgwick's decision by submitting a written request for review within 90 days of receiving the denial letter (id.). With the assistance of an attorney, the plaintiff submitted a written request for a second-level appeal on February 17, 2012 (AR 000413-63). The primary focus of this appeal was Sedgwick's consideration of the plaintiff's fibromyalgia diagnosis, and the denial of her claim in this regard based on a lack of objective medical evidence.

The plaintiff's appeal letter was supported by approximately 500 pages of exhibits, including letters from Dr. Katzin and Dr. Khalil, as well as records from several other doctors and medical facilities (see AR 000521-23, 000524-25, 000526-38, 000539-736, 000737-71, 000772-927). Many of the treatment records were duplicative of the medical evidence previously received by Sedgwick (see Doc. 42, pp. 12-13; Doc. 53).

In a February 2012 letter, Dr. Katzin stated that "[i]n conjunction with the rheumatology department at the Mayo Clinic, I have diagnosed [the plaintiff] with Fibromyalgia" (AR 000522). Dr. Katzin further explained (AR 000522-23) (emphasis in original):

> I disagree with Sedgewicks [sic] assessment of Ms. Cramasta's condition. Ms. Cramasta's diagnosis of fibromyalgia, chronic fatigue, migraine headaches, joint pain and myalgias ARE restricting, limiting, disabling and debilitating and have prevented her from performing her usual and customary job as a Pharmacist. Unfortunately, there is no objective test for Fibromyalgia as the diagnosis is based on physical examination and the patient[']s subjective complaints.
>
> Based on my care and treatment of Ms. Cramasta, it is my professional medical opinion[] that she suffers from Fibromyalgia Syndrome, characterized primarily by constant, chronic pain, extreme fatigue, cognitive impairment and insomnia. Ms. Cramasta experiences moderate to severe, chronic and throbbing pain in her wrists, elbows, knees, chest, neck, and hips on a daily basis. The pain she experiences is so debilitating that it causes her severe fatigue to the point where she is not able to function in her home or work environment. Furthermore, the medication she takes to help control her pain cause her significant side-effects which interfere[] with her ability to focus and concentrate. Ms. Cramasta is unable to sit or stand for any extended period of time without significant pain. The chronic fatigue she suffers

makes it impossible for her to concentrate on even the simplest tasks. <u>All of these symptoms greatly impair her ability to function in her work and home environment. All previous attempts to get Ms. Cramasta back to work on a regular basis have failed. Ms. Cramasta cannot perform even sedentary work due to pain, fatigue and the resulting cognitive impairment. As a result of Ms. Cramasta's medical diagnosis of Fibromyalgia Syndrome, which causes constant, chronic pain, fatigue, cognitive impairment and insomnia, Ms. Cramasta is not capable of performing the material and substantial duties of her occupation as a Pharmacist for Walgreens. Additionally, there is no clear indication at this point when or if Ms. Cramasta will return to work.</u>

Dr. Khalil also wrote a letter in support of the plaintiff's second appeal (AR 000525). Dr. Khalil opined that the plaintiff's fibromyalgia, chronic fatigue, migraine headaches, joint pain, and myalgias are disabling (<u>id</u>.). She also noted that there are no objective tests for fibromyalgia (<u>id</u>.). Dr. Khalil recommended that the plaintiff not return to her job as a pharmacist because "she is unable to perform the essential duties of her occupation and may put her patients at risk" (<u>id</u>.). The letter further stated (<u>id</u>.) (emphasis in original):

Based on my care and treatment of Ms. Cramasta, it is my professional medical opinion that she suffers from Fibromyalgia Syndrome, with 12

positive trigger points characterized primarily by constant chronic pain, extreme fatigue, cognitive impairment and insomnia. Ms. Cramasta experiences moderate to severe chronic throbbing pain in her wrist, elbows, knees, chest, neck and hips on a daily basis. The pain she experiences is so debilitating that it causes her severe fatigue to the point where she is not able to function in her home or work environment. Furthermore, the medication she takes to help control her pain causes her significant side-effects which interferes with her ability to focus and concentrate. Ms. Cramasta is unable to sit or stand for any extended period of time without significant pain. The chronic fatigue she suffers makes it impossible for her to concentrate on even the simplest tasks. All of these symptoms greatly impair her ability to function in her work environment. All previous attempts to get Ms. Cramasta back to work on a regular basis have failed. Ms. Cramasta cannot perform even sedentary work due to pain, fatigue, and the resulting cognitive impairment. As a result of Ms. Cramasta's medical diagnosis of Fibromyalgia Syndrome, which causes constant, chronic pain, fatigue, cognitive impairment and insomnia Ms. Cramasta is not capable of performing essential duties of her occupation as a Pharmacist at Walgreens. Additionally, there is no clear indication at this point when Ms. Cramasta will return to work.

In March 2012, Stephanie Jackson, a Sedgwick appeals specialist, referred the plaintiff's claim for medical reviews by three additional doctors, Dr. Stuart Gitlow, Dr. Richard Kaplan, and Dr. Bruce

LeForce (see AR 000019-20). Each of these doctors received a copy of the plaintiff's medical records (see AR 000965-70, 000978-84, 000989-94).

On April 4, 2012, Dr. Gitlow, a board-certified psychiatrist, submitted a report to Sedgwick indicating that the plaintiff is not disabled from a psychiatric perspective (AR 000961-70).[5]

Dr. Kaplan, a board-certified specialist in physical medicine and rehabilitation and pain management, reviewed the plaintiff's medical records "from a physical medicine and rehabilitation/pain management perspective" (AR 000971).[6] In his report, after summarizing the medical records, Dr. Kaplan stated (AR 000975):

> The medical records do not establish that this claimant is disabled f[ro]m her usual occupation as a pharmacist as of September 19, 2011 forward.
>
> The claimant has been evaluated at a variety of medical centers with very detailed evaluation regarding a generalized syndrome of pain, depression, sleep dysfunction and subjective cognitive deficits.
>
> Overall, other than the impression that this claimant has apparently sub-optimally treated

---

[5] Dr. Gitlow left two telephone messages for Dr. Khalil, but he did not receive a return call (AR 000963).

[6] Dr. Kaplan's attempts to contact Dr. Katzin were unsuccessful (AR 000976-77).

depression, there is no clear specific diagnosis
which can be confirmed.

In response to a question from Sedgwick about the clinical findings contained

in the medical record and the impact of those findings on the plaintiff's

ability to function in her regular, unrestricted occupation, Dr. Kaplan said, in

pertinent part (AR 000975-76):

> The medical records in this case are extremely
> detailed, probably almost 1000 pages. The
> claimant is reported to have multiple potential
> diagnoses. Most notably, the claimant reports
> generalized pain and fatigue felt due to
> fibromyalgia and sleep dysfunction with possible
> diagnosis of pseudotumor cerebri and myasthenia
> gravis.
>
> Regarding the diagnosis of fibromyalgia, repeated
> musculoskeletal and neurological examinations
> demonstrate normal strength, coordination, gait,
> and range of motion. The standard of care for
> treatment of fibromyalgia suggests that
> maintenance of some level of vocational activity
> such as full time work as a pharmacist would be
> encouraged as therapeutic and thus restrictions and
> limitations would not be limited from that
> perspective.
>
> . . .
>
> Thus overall, the medical records are very
> complex. However, from a physical rehabilitation
> and pain management perspective, there is no

documented deficit in terms of gait, coordination, cognitive abilities, strength, coordination, sensation or other factors prohibiting the claimant from working at her usual occupation during the time period in question.

Dr. LeForce, a board-certified specialist in neurology and clinical neurophysiology, conducted an independent review of the plaintiff's claim from a neurological perspective (AR 000985-94). As part of his review, Dr. LeForce spoke with Dr. Q.A. Fattah, a neurologist, and Dr. Katzin (AR 000988). In this regard, Dr. LeForce stated (id.):

Dr. Fattah notes that the claimant's neurologic examination and imaging studies were unremarkable. The claimant had positive laboratory testing to support myasthenia gravis and the claimant was started on Mestinon. There were no findings that would prevent the claimant from working.

Dr. Katzin indicates that based on the claimant's fatigue and mental fogginess the claimant is unable to continue full time work as a retail pharmacist. Dr. Katzin notes that if there were opportunities to work while seated and to take more frequent breaks, the claimant would be able to do some of her usual job. The claimant would likely be able to work from home performing medication reviews.

Dr. LeForce opined that the plaintiff was not neurologically disabled as of September 19, 2011 (AR 000986). He provided the following "Assessment/ Rationale" for this conclusion (AR 000988):

> The claimant is a 32 year old female with fibromyalgia and chronic fatigue. The claimant has been diagnosed with myasthenia gravis, which is treated with Mestinon.
>
> Based on documented examinations the myasthenia gravis is under good control.
>
> There are no documented abnormalities on neurologic examination that would support impairment. The claimant's MRI of the brain demonstrated some pituitary changes, but no abnormalities of the brain.
>
> Electrodiagnostic studies are normal.
>
> There are no objective findings on examination, imaging, or other testing to support inability to perform the claimant's usual occupation.
>
> The claimant is capable of full time work as of September 19, 2011 to return to work date.

On May 2, 2012, Sedgwick again upheld its previous denial of the plaintiff's claim for short-term benefits, on the basis that "the medical evidence reviewed, did not substantiate a disability as defined under the Plan"

(AR 000995).  Thus, after summarizing the reports of the independent

physician advisors, Sedgwick stated (AR 001000):

> The Unit has concluded that the medical evidence
> reviewed did not reveal functional abnormalities or
> impairments to support the presence of a restriction
> or limitations precluding Ms. Cramasta from
> performing one or more of the essential duties of
> her Walgreens occupation, as a Pharmacist.
>
> Therefore, Ms. Cramasta's claim for Income
> Protection Plan benefits will remain denied for her
> absence beginning, September 19, 2011 to her
> return to work date.

Sedgwick explained that its decision on the plaintiff's claim was final;

however, if the plaintiff disagreed with the decision, she had the right to file

a civil action under Section 502(a) of ERISA (id.).

During a telephone conversation on May 4, 2012, the plaintiff's

attorney advised Jackson, Sedgwick's appeal specialist, of the plaintiff's

intent to file a lawsuit (AR 000004).  Jackson confirmed that the plaintiff had

exhausted all of her administrative remedies under ERISA (id.).  In response

to counsel's inquiry about the need to include long-term disability benefits

in the lawsuit, Jackson advised that she was "unable to provide a legal answer

as the LTD has not been evaluated or determined given that [employee] was denied STD benefits under the plan" (id.).

In June 2012, the plaintiff brought this action alleging breach of contract against Walgreens and Sedgwick (Doc. 1). Subsequently, with permission from the court (Doc. 18) and in response to the defendants' motion to dismiss the breach of contract claims (see Docs. 12, 17), the plaintiff filed a second amended complaint asserting only violations of ERISA (Doc. 19). According to her motion for summary judgment, the plaintiff is seeking "8 weeks of full STD pay totaling $19,840; 26 weeks of STD half pay totaling $32,240; and LTD payments of $4,960 a month through the entry of final judgment in this action" (Doc. 41, p. 4).

The parties filed cross-motions for summary judgment (Docs. 41, 42). The defendants argue that they are entitled to summary judgment because Sedgwick's denial of the plaintiff's claim for benefits was reasonable and supported by the opinions of four independent reviewing physicians. The plaintiff, on the other hand, asserts that the denial of benefits was de novo wrong because Sedgwick did not have discretionary authority under the Plan to make benefits determinations. Further, the plaintiff contends that the

decision was arbitrary and capricious because, among other things, Sedgwick improperly required the plaintiff to support her claim of disabling fibromyalgia with objective medical evidence.

The motions were referred to me for a report and recommendation (Doc. 46). Subsequently, oral argument was heard on the motions.

## II.

A. The parties have brought their motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56(a), F.R.Civ.P., provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

At the hearing, the parties essentially agreed that there are no material issues of fact that require a trial. Furthermore, defense counsel stated that the normal standard for summary judgment does not apply in these types of cases and there should not be a trial; rather, this is merely a legal question, to be considered on the basis of the administrative record.

"'In an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.'" Curran v. Kemper Nat. Services, Inc., 2005 WL 894840 at *7 (11th Cir.) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)). Accordingly, when reviewing a decision for abuse of discretion, "'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" Crume v. Metro. Life Ins. Co., 417 F.Supp.2d 1258, 1272 (M.D. Fla. 2006) (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999)). Thus, "conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's

decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable." Id. at 1273.

B. An ERISA benefit plan participant may bring a civil action "to recover benefits due to h[er] under the terms of h[er] plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to future benefits under the terms of the plan." 29 U.S.C. 1132(a)(1)(B). A plaintiff suing to recover benefits or enforce rights under ERISA bears the burden of proving her entitlement to benefits. Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998).

ERISA does not provide a standard for reviewing a benefits decision made by a plan administrator or fiduciary. Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011). Thus, based on guidance from the Supreme Court in Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008) and Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Eleventh Circuit has articulated a six-step analysis for reviewing these decisions:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship v. Metro. Life Ins. Co., supra, 644 F.3d at 1355. All steps in this analysis are "potentially at issue" when the plan administrator has discretion in reviewing claims under the plan. Id. at 1356 n.7.

III.

A. The plaintiff contends that de novo review must solely be used in this case. The basis for this contention is that the SPD does not

properly grant discretion to Sedgwick because the SPD "cannot be the Plan document for purposes of an action under 29 U.S.C. §1132(a)(1)(B)" (Doc. 43, p. 2; see Doc. 41, pp. 12-14).[7] This theory is supported by United States District Judge Patricia Fawsett's decision in Wilson v. Walgreen Income Protection Plan for Pharmacists and Registered Nurses, 2013 WL 1799599 (M.D. Fla.). The weight of authority, however, is to the contrary. Campbell v. Chevron Phillips Chemical Co., 587 F.Supp.2d 773, 782 (E.D. Tex. 2006); Hamilton v. Air Jamaica, Ltd., 750 F.Supp. 1259, 1265 (E.D. Pa. 1990), rev'd on other grounds, 945 F.2d 74 (3rd Cir. 1991); Cooke v. Carter Hawley Hale Stores, Inc., 1986 WL 7655 at *4-5 (N.D. Ill. 1986); see Alday v. Container Corp. of Am., 906 F.2d 660, 662 n.2 (11th Cir. 1990).

For example, Campbell v. Chevron Phillips Chemical Co., supra, 587 F.Supp.2d at 782 (citations omitted), states that "one document can serve as both the 'summary plan description' required under 29 U.S.C. § 1022(b) and the 'written instrument' required under 29 U.S.C. § 1102(a)(1)."

---

[7] ERISA provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. 1102(a)(1). Further, "[a] summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries...." 29 U.S.C. 1022(a).

Similarly, in <u>Cooke</u> v. <u>Carter Hawley Hale Stores, Inc.</u>, <u>supra</u>, 1986 WL 7655 at *5, the court said that "a summary plan description may serve as a 'written plan.'" The weight of authority is the most persuasive.

Moreover, it is stated in bold type, "**This Summary Plan Description is the official Income Protection Plan governing document for purposes of describing the various plan provisions**" (AR 001102). Consequently, the plaintiff's contention is anomalous since, if the SPD — which is the only document extant – is ineffective, then it could not be the basis for an award of disability benefits. At the very least, if the SPD is invalid or otherwise inoperative, then the provisions stating that benefits may be awarded, and stating the criteria for determining such an award, would be inapplicable. In all events, the plaintiff cannot plausibly argue that the language for determining whether benefits should be awarded is applicable, but that the language saying that such a determination is in the sole discretion of the claims administrator is not.

Accordingly, in the cases involving the same benefit plan at issue here, except for <u>Wilson</u>, the courts use the arbitrary and capricious standard. <u>Carson</u> v. <u>Walgreen Income Protection Plan for Pharmacists and</u>

Registered Nurses, Case No. 7:12-CV-25(HL) (M.D. Ga. 2013) (Doc. 25);
Schnoor v. Walgreen Income Protection Plan for Pharmacists and Registered
Nurses, 2013 WL 4248225 at *2 n.4 (W.D. Mich.) ("The parties agree that
the correct standard of review in this case is the arbitrary and capricious
standard. The Plan grants discretion to a third-party claim administrator.");
Oates v. Walgreen Co., 2013 WL 1632011 at *6 (M.D. Fla.); Huber v.
Walgreen Income Protection Plan for Pharmacists and Registered Nurses,
Case No. 4:09-CV-458-TUC-RCC (D. Az. 2011) (Doc. 47). The plaintiff
responds that is because the courts assumed that that was the proper standard.
However, the fact that plaintiff's counsel in those cases did not make the de
novo argument made here indicates that the lawyers did not perceive the
argument to be persuasive.

For these reasons, the SPD is properly considered the governing
Plan document. Consequently, there is no basis for applying any standard
other than the established six-step test.

B. As indicated, the Eleventh Circuit's framework requires the
court to decide first if Sedgwick's denial of the plaintiff's claim for benefits
was de novo wrong. See Blankenship v. Metro. Life Ins. Co., supra, 644 F.3d
at 1355. A decision made by an administrator is "wrong" if, after a de novo

review of the decision, the court does not agree with the decision. <u>Glazer</u> v. <u>Reliance Standard Life Ins. Co.</u>, 524 F.3d 1241, 1246 (11th Cir. 2008).

In my view, Sedgwick's decision was wrong. Sedgwick accepted the diagnosis of fibromyalgia. However, as explained in more detail at a later step of the analysis, that condition cannot be detected by laboratory tests, so that it is characterized by a lack of objective evidence. <u>Moore</u> v. <u>Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005). Consequently, a claim of disability based upon a diagnosis of fibromyalgia cannot be rejected simply on the basis of a lack of objective medical findings. Since that appears to be what Sedgwick did, its decision is wrong.

The next step, therefore, is to determine whether Sedgwick was vested with discretion in reviewing claims, because, if it was not, the decision is to be reversed. However, in this case Sedgwick was given discretion in reviewing claims.

The SPD, which, as explained, is properly considered the governing Plan document, expressly states (AR 001119):

> The authority granted to the Claim Administrator and the Plan Administrator to construe and interpret the Plan and make benefit determinations, including claims and appeals determinations, shall be exercised by them (or persons acting under their

> supervision) as they deem appropriate in their sole
> discretion. Benefits under this plan will be paid or
> provided to you only if the Claim Administrator or
> the Plan Administrator, as the case may be, decides
> in its discretion that you are entitled to them.

This language clearly grants Sedgwick the discretionary authority to make benefit decisions under the Plan. As indicated, other courts considering the Plan have reached the same conclusion. Consequently, Sedgwick's denial of short-term benefits is governed by the "arbitrary and capricious" standard of review.

The plaintiff asserts, in passing, that the SPD "cannot be found to properly grant discretion to Sedgwick" because Walgreens "failed to follow its own procedures when amending the plan to grant discretion to Sedgwick, in clear violation of ERISA" (Doc. 43, pp. 4-5). At the hearing, plaintiff's counsel explained that policy holders are to be informed of all changes with the Plan, and she seemed to indicate that the plaintiff was not notified when Sedgwick became the Plan's claim administrator.

This contention, however, is unpersuasive. In the first place, the plaintiff has failed to make any showing that her claim was negatively affected by the change in claim administrators. Furthermore, it seems disingenuous to argue now that the plaintiff had no notice of the change in

claim administrators when she received a copy of the SPD (see Doc. 41, p. 2) and, in fact, contacted Sedgwick to submit her initial claim. Therefore, it is not plausible to contend that, because there was a change in claim administrators, the arbitrary and capricious standard no longer applies.

"When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989). As long as there was a reasonable basis for the denial of benefits, the decision "'must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision.'" White v. Coca-Cola Co., 542 F.3d 848, 856 (11th Cir. 2008) (quoting Jett v. Blue Cross & Blue Shield of Ala., Inc., supra, 890 F.2d at 1140). If the "evidence is close," the administrator did not abuse its discretion in denying benefits. Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1363 (11th Cir. 2008); Pinto v. Aetna Life Ins. Co., 2011 WL 536443 at *9 (M.D. Fla.).

As the plaintiff argues (Doc. 41, pp. 17-18, 19-21), a lack of objective evidence is not an adequate basis for rejecting a claim of disability caused by fibromyalgia, which is characterized by a lack of objective medical findings. Moore v. Barnhart, supra, 405 F.3d at 1211.

Sedgwick's reviewing physicians noted, and apparently accepted, the plaintiff's diagnosis of fibromyalgia in their reports (see AR 000975, 000977, 000985, 000988, 001078, 001079, 001081). These physicians, however, did not acknowledge the distinctive characteristic of fibromyalgia, even though that was expressly mentioned by the plaintiff's treating neurologist and primary care physician.

"Fibromyalgia is a condition characterized by widespread pain in joints, muscles, tendons and soft tissues." Heppell-Libsansky v. Commissioner of Social Security, 170 Fed. Appx. 693, 695 n.1 (11th Cir. 2006). The Eleventh Circuit, as indicated, has noted that the hallmark of fibromyalgia is a lack of objective evidence. Moore v. Barnhart, supra. As explained in Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996):

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain

all over," fatigue, disturbed sleep, stiffness, and –
the only symptom that discriminates between it and
other diseases of a rheumatic character – multiple
tender spots, more precisely 18 fixed locations on
the body (and the rule of thumb is that the patient
must have at least 11 of them to be diagnosed as
having fibromyalgia) that when pressed firmly
cause the patient to flinch.

Accordingly, the Eleventh Circuit has said that, "[g]iven the nature of
fibromyalgia, a claimant's subjective complaints of pain are often the only
means of determining the severity of a patient's condition and the functional
limitations caused thereby," since physical examinations will usually yield
normal results. Somogy v. Commissioner of Social Security, 366 Fed. Appx.
56, 64 (11th Cir. 2010).  Consequently, where a plaintiff has fibromyalgia, a
claim administrator cannot reasonably deny disability benefits for that
condition based on a lack of objective medical evidence.

Two of the plaintiff's treating physicians submitted letters in
support of the plaintiff's second-level appeal, which essentially opined that,
due to the plaintiff's fibromyalgia and other medical conditions, the plaintiff
was disabled from working (AR 000522-23, 000525). As indicated, they also
explained that there are no objective tests for fibromyalgia (id.). In addition,
a report from the Mayo Clinic's Rheumatology Department indicates that the

plaintiff has muscle tenderness and trigger points consistent with fibromyalgia (AR 000845). Significantly, "[f]ibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist." Sarchet v. Chater, supra, 78 F.3d at 307.

Sedgwick's denial letters accepted the diagnosis of fibromyalgia (AR 000997, 000998, 001085). Those denial letters, however, do not acknowledge fibromyalgia's unique characteristic of a lack of objective medical evidence. To the contrary, the letters indicate that the claim of disability was denied due to a lack of objective medical evidence.

Thus, the initial denial referred to the absence of abnormal findings (AR 000348). Thereafter, the letter of denial of November 21, 2011, on the first level of appeal stated (AR 001085):

> Your subjective complaints of body aches, pains, myalgias, and arthralgias, in the absence of associated neurological deficits, would not support your inability to perform in your usual and customary, unrestricted job as a Pharmacist.
>
> Moreover, you had near normal to normal diagnostic testing, and a negative electromyography/nerve conduction velocity (EMG/NCV) of the bilateral upper and lower extremities.
>
> . . .

> From an Occupational medicine perspective, there are no clinical objective findings to support your inability to perform in your regular unrestricted job as a Pharmacist from September 19, 2011 to your return to work date.

Similarly, the denial letter of May 2, 2012, on the second level of review said, among other things (AR 000998-99):

> Records reviewed document repeated musculoskeletal and neurological examinations demonstrating normal strength, coordination, gait and range of motion. The cervical spine magnetic resonance imaging (MRI), performed on August 4, 2011 demonstrates some disc bulges, but no spinal stenosis or cord abnormalities. The electromyography/nerve conduction velocity (EMG/NCV) studies identified no evidence of neuropathy, myopathy or neuromuscular transmission abnormalities. Dr. Fattah's neurological examination dated August 11, 2011 noted normal mental status, cranial nerves, motor strength, coordination, sensation and gait.
>
> . . .
>
> From a physical rehabilitation and pain management perspective, review of the medical records reviewed revealed that Ms. Cramasta is noted to have multiple potential diagnoses, to include her reports, generalized pain, and fatigue due to fibromyalgia; sleep dysfunction, with possible diagnosis of pseudotumor cerebri and myasthenia gravis. However, the medical evidence reviewed did not reveal documented deficits in terms of gait, coordination, cognitive abilities,

strength, sensation and any or other factors precluding her from performing her regular, unrestricted occupation.

. . .

From a neurological perspective, Ms. Cramata's [sic] records document repeated neurologic examinations by multiple physicians that did not identify any abnormalities that would result in impairment. Imaging studies of the brain and cervical spine identified no abnormalities. The electrodiagnostic studies were normal and the magnetic resonance imaging (MRI) of the brain identified no abnormalities that would support a functional impairment.

Dr. LeForce opined that the medical records reviewed did not establish that Ms. Cramasta is disabled from her regular, unrestricted occupation as a Pharmacist. Dr. LeForce's review revealed Ms. Cramasta's examination findings to be essentially normal and there are no abnormalities on neurological examination to support an impairment that restricts or limits her functionality. There are no objective findings on examination, neuroimaging; and or the laboratory studies to support, Ms. Cramasta's inability to perform her occupation. Dr. LeForce concluded that Ms. Cramasta is capable of full-time work as of September 19, 2011 to her return to work date.

In light of the diagnosis of fibromyalgia, which Sedgwick apparently accepted, the disability claim could not reasonably be denied simply on the basis of a lack of objective medical evidence. This issue

-39-

appears with some frequency in Social Security cases, and I have reversed, or recommended reversal of, the Commissioner of Social Security in a number of cases because the administrative law judge erroneously denied a disability claim predicated on fibromyalgia on the ground of a lack of objective medical evidence. See, e.g., Haynes v. Astrue, Case No. 8:09-CV-392-T-TGW; Pulfer v. Astrue, Case No. 8:06-CV-1024-T-TGW; Enright v. Astrue, Case No. 8:02-CV-1225-T-TGW. While I recognize that the governing principles are not necessarily the same in ERISA and Social Security cases, there is no plausible justification for evaluating fibromyalgia differently in those cases.

Sedgwick's error in evaluating the plaintiff's fibromyalgia, however, does not mean that the plaintiff is entitled to an award of benefits at this point. Rather, the proper course is to remand the matter to the claim administrator for an evaluation that corrects the error of demanding objective medical findings. Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 621-22 (6th Cir. 2006); Rekstad v. U.S. Bancorp, 451 F.3d 1114, 1120-21 (10th Cir. 2006); Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 31 (1st Cir. 2005). In an analogous situation, the Eleventh Circuit and United States

District Judge John Antoon, II, have said that it is impossible to apply the arbitrary and capricious standard. Barlow v. Sun Life & Health Ins. Co., 488 Fed. Appx. 458 (11th Cir. 2012); Hall v. Hewlett-Packard Co., 2013 WL 2447951 at **11-12 (M.D. Fla.).

On remand, Sedgwick may wish to question the diagnosis of fibromyalgia. Thus, a fibromyalgia diagnosis is typically reflected by a figure showing the outline of a body and "x's" marked on the figure where the trigger points had been positive. There is no such diagram in this record.

Moreover, as indicated, fibromyalgia is diagnosed by a rheumatologist. Sarchet v. Chater, supra, 78 F.3d at 307. Neither Dr. Khalil or Dr. Katzin are rheumatologists. Consequently, the diagnosis of fibromyalgia is outside their areas of speciality. Thus, Sedgwick may want to have an independent medical examination by a rheumatologist.

Furthermore, even if the plaintiff is correctly diagnosed with fibromyalgia, that does not necessarily mean that she is disabled. See Sarchet v. Chater, supra (stating that "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working ..., but most do not ...."). Other circumstances, such as activities of daily living, can show that she is

not disabled. For example, the medical records indicate that the plaintiff attended a cruise after submitting her disability claim, and she planned to go back to school (AR 000683, 000813).[8] In addition, Dr. Ledford and Dr. Butendieck suggested that the plaintiff participate in aerobic activity (AR 000206, 000846). Under these circumstances, an award of benefits is not warranted at this time.

C. The plaintiff asserts that "she is entitled to and has properly brought a claim for [long-term disability] benefits in this case as it would be an exercise in futility to attempt to exhaust her administrative remedies regarding her LTD claim" (Doc. 43, p. 16). The defendants respond that the plaintiff's request for long-term benefits is improper because she was never found to be disabled pursuant to the Plan (Doc. 42, p. 3 n.3).

The SPD provides that a claimant is eligible for long-term benefits after she has "accumulated a total of 180 disability days during any consecutive 365 day period" (AR 001108). There is no application for long-term benefits; rather, "Sedgwick's/Walgreen[s'] protocol is to roll the

_____

[8] The plaintiff takes issue with the defendants' "inaccurate allegations and falsehoods" about her plans to go to school and her cruise (Doc. 43, pp. 18-19). However, the explanations proffered by the plaintiff were not contained in the administrative record, upon which the claim decision was based.

claimant over into long-term disability once they complete their short term disability benefits, should they continue to be deemed as disabled" (AR 000001; see AR 000002). In this case, the plaintiff's eligibility for long-term benefits "has not been evaluated or determined given that [the plaintiff] was denied [short-term disability] benefits under the plan" (AR 000004).

The plaintiff suggests that her request for long-term benefits is proper because the Plan covers both long-term and short-term benefits, there is no application process for long-term benefits, and the Plan's disability definitions for long-term and short-term benefits "are nearly identical" (Doc. 43, p. 18). This assertion is unavailing.

In the first place, "nearly identical" and identical are not the same, and the defendants contend that the Plan's long-term benefits "implicates a more stringent eligibility standard" than short-term benefits (Doc. 48, pp. 18-19). Regardless, in light of the remand for further consideration of the claim for short-term benefits, any issue regarding long-term benefits is premature.

D. In a footnote, the defendants contend that Walgreens should be dismissed from this action because "Sedgwick, not Walgreens, processes

claims under the Plan and is thus the appropriate Defendant" (Doc. 42, p. 25 n.39). This undeveloped argument is unpersuasive.

In the Eleventh Circuit, "[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan." Garren v. John Hancock Mut. Life Ins. Co., 114 F.3d 186, 187 (11th Cir. 1997); see Hamilton v. Allen-Bradley Co., Inc., 244 F.3d 819, 824 (11th Cir. 2001) ("[I]f the employer is administering the plan, then it can be held liable for ERISA violations."). Here, the Plan is funded by Walgreens, benefits are paid by Walgreens, and Walgreens is the Plan Administrator (AR 001105, 001108, 001122). Furthermore, the SPD states that "Walgreen Co. reserves the right to alter, amend or cancel the Plan at its sole discretion" (AR 001122). Finally, the SPD directs claimants to contact Walgreens with any questions regarding the Plan (id.). Thus, contrary to its contention, it appears that Walgreens serves as more than a mere conduit between its employees and Sedgwick. Consequently, Walgreens is clearly not entitled to summary judgment on its claim for dismissal.

IV.

The conclusion that the defendants acted unreasonably in considering the plaintiff's diagnosis of fibromyalgia warrants a remand. See Barlow v. Sun Life & Health Ins. Co., supra. On remand, the defendants may determine that the plaintiff does not suffer from fibromyalgia or that her fibromyalgia is not as severe as she has alleged. However, the defendants must consider the distinctive characteristics of fibromyalgia in making their determination.

The Eleventh Circuit has held that remanding an ERISA case to an administrator for further proceedings does not constitute a final decision. Young v. Prudential Ins. Co. of Am., 671 F.3d 1213 (11th Cir. 2012). Therefore, the Court will retain jurisdiction to decide any timely motion for judicial review following the proceedings at the administrative level.

V.

For the foregoing reasons, I recommend that the Plaintiff's Dispositive Motion for Summary Judgment (Doc. 41) be granted to the extent that the matter is remanded to the defendants for proper consideration of the plaintiff's fibromyalgia diagnosis. I further recommend that the Defendants'

Dispositive Motion for Summary Judgment (Doc. 42) be denied.  I also recommend that the case be administratively closed.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: NOVEMBER 22, 2013

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).